IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| Frank S. Vaccaro, | ) | Case No. 09 B 08674 |
| | ) | |
| Debtor. | ) | |
| The Estate of Paula F. Bartlett, deceased, by and through Sima Dahl, personal representative, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Adv. No. 09 A 00476 |
| Frank S. Vaccaro, | ) ) | |
| Defendant. | ) | Hon. Susan Pierson Sonderby |

**MEMORANDUM OPINION**

This matter comes before the court on the Motion of Frank S. Vaccaro (the "Debtor") to Dismiss Adversary Complaint to Determine Dischargeability. For the reasons stated herein, the motion will be denied.

This court has jurisdiction over this core proceeding to determine dischargeability of a particular debt. 28 U.S.C. § 1334(b); Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois; 28 U.S.C. § 157(b)(2)(I). Venue is proper in this court pursuant to 28 U.S.C. §1409(a).

On March 26, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Code"). Prior to the Petition Date, Paula Bartlett ("Bartlett") filed a complaint in the Circuit Court of Cook County, Illinois, Chancery Division (the "State Court Complaint") against the Debtor and his wife, Linda Carlini,

seeking various forms of relief for, *inter alia*, conversion and breach of fiduciary duty. On the Petition Date, the State Court litigation had not progressed to a judgment or other resolution. On June 11, 2009, Sima Dahl, Paula Bartlett's then guardian, filed this two-count adversary complaint against the Debtor on Bartlett's behalf to determine the dischargeability of the debt addressed by the State Court Complaint.

On September 19, 2009, the Debtor filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), made applicable herein by Fed. R. Bank. P. 7012(b). Bartlett passed away two days later. The complaint was amended with leave of court on November 16, 2009, to substitute Bartlett's estate, by and through Sima Dahl as its personal representative, as plaintiff (the "Plaintiff"). The parties thereafter proceeded with the motion to dismiss as if it were filed with respect to the amended complaint. The court will do likewise. *See* 6 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE, § 1476 (3d ed. 2010)("[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending. If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance.").

The Plaintiff brings the amended complaint (hereafter, the "Adversary Complaint") seeking a determination that the debt owing the Plaintiff is nondischargeable pursuant to section 523(a)(4) of the Code (Count I) and/or section 523(a)(6) of the Code (Count II). The well plead allegations of the Adversary Complaint are assumed to be true for purposes of the motion to dismiss, all reasonable inferences being drawn in Plaintiff's favor. Reger Development, LLC v. National City Bank, 592 F.3d 759, 763 (7th Cir. 2010). The exhibits referred to and incorporated in and attached

to the Adversary Complaint, consisting of the State Court Complaint with its exhibits, are part of the Adversary Complaint and are also being considered. Fed. R. Civ. P. 10(c) made applicable herein by Fed. R. Bank. P. 7010; 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002); Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc., 2010 WL 1540125, *10 n. 4 (N.D. Ill. Apr. 13, 2010).

In his motion to dismiss pursuant to Rule 12(b)(6), the Debtor contends that the Adversary Complaint fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must pass over "two easy to clear hurdles":

> First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." . . . Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court.

E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007) (*citing* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed. 929 (2007)). The Debtor raises some concerns about whether the claim is sufficiently described, but the dispute here centers primarily on whether Plaintiff states a plausible claim. Plausibility means that the allegations in a complaint must permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, - - - U.S. - - -, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order to "enter the realm of plausible liability," the allegations must cross two lines, the line "between the conclusory and the factual" and the line "between the factually neutral and the factually suggestive." Bell Atlantic, 127 S.Ct. at 1966 n.5.

In deciding whether the pleader has made allegations plausibly suggesting a right to relief,

3

the court considers the context of the complaint, *i.e.*, the type of case. <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1083 (7th Cir. 2008). "In each context, we must determine what allegations are necessary to show that recovery is 'plausible.'" <u>Id.</u> (*citing* <u>Limestone Development Corp. v. Village of Lemont Inc.</u>, 520 F.3d 797, 803-04 (7th Cir. 2008)). This determination necessarily involves the court considering the elements of the claim, although the pleader's mere parroting of the elements will not suffice. *See* <u>Bell Atlantic</u>, 550 U.S. at 562; <u>Brooks v. Ross</u>, 578 F.3d 574, 581 (7th Cir. 2009)("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.").

In what appears to be its most recent detailed opinion on this subject, the Seventh Circuit Court of Appeals provides further instruction on how to understand plausibility:

> "Plausibility" in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not. Indeed, the Court expressly distanced itself from the latter approach in Iqbal, "the plausibility standard is not akin to a probability requirement." 129 S.Ct. at 1949 (quotation marks omitted). *As we understand it, the Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.* In other words, the court will ask itself could these things have happened, not did they happen.

<u>Swanson v. Citibank, N.A.</u>, 614 F.3d 400, 404 (7th Cir. 2010)(emphasis added).

With these guidelines in mind, the present task for this court is to determine if this Adversary Complaint contains enough sufficiently detailed nonconclusory allegations to suggest that recovery is plausible in this proceeding involving a determination of nondischargeability under sections 523(a)(4) and 523(a)(6) of the Code. In other words, the court asks whether the Plaintiff has given enough details through the well plead (*i.e.*, nonconclusory) allegations about this nondischargeability claim to present a story that holds together.

The court will first discuss the section 523(a)(4) claim asserted in Count I. Section 523(a)(4) provides, in relevant part, that a chapter 7 discharge does not discharge an individual debtor from debts for fraud or defalcation while acting in a fiduciary capacity. *See* 11 U.S.C. § 523(a)(4). To prevail on this type of section 523(a)(4) claim of nondischargeability, the plaintiff must demonstrate "the existence of an express trust or fiduciary relation, and a debt caused by the Debtor's defalcation [or fraud] while acting as a fiduciary." In re McDade, 282 B.R. 650, 657 (Bankr. N.D. Ill. 2002). Here, the Plaintiff maintains that the debt at issue should be excepted from discharge under section 523(a)(4) because a fiduciary relationship existed between the Debtor and Bartlett and the Debtor committed fraud or defalcation while acting as Bartlett's fiduciary.

A fiduciary relationship may arise in the context of "trusts in a formal sense," In re Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994), or from a statute or ordinance which "set[s] forth real attributes creating a trust-like relation." In re McCarthy, 350 B.R. 820, 834 (Bankr. N.D. Ind. 2006)(*citing* In re McGee, 353 F.3d 537, 540-44 (7th Cir. 2003)).

A fiduciary relationship can also exist in situations which "seem[] to call for the imposition of the same high standard" of loyalty and care as a formal trust, such as where "one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals." Marchiando, 13 F.3d at 1115-1116. These situations involve a fiduciary relation which was in existence prior to the debtor's wrong and are "characterized by disparities in the knowledge or economic status of the participants," the fiduciary having the superior status and/or knowledge to the defrauded creditor victim. McGee, 353 F.3d at 541; *see also* In re Woldman, 92 F.3d 546, 547 (7th Cir. 1996)("section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power

5

or knowledge in favor of the debtor seeking the discharge and the creditor resisting the discharge.").

In some instances, the requisite superior status and/or knowledge establishing a fiduciary relationship has been found where the creditor/plaintiff is vulnerable due to advanced age, poor health, and isolation. *See, e.g.*, In re Kohler, 255 B.R. 666, 669 (Bankr. E.D. Pa. 2000)(court agreed with Orphans' Court's assessment that the position of ascendancy existing in the confidential relationship between the debtor and an isolated, dependent, and elderly woman who dreaded being placed in a nursing home involved a fiduciary relationship, rather than a mere arms-length commercial relationship); In re Youngblood, 2009 WL 1232103, * 9 (Bankr. S.D. Tex. Apr. 29, 2009)(court found a fiduciary duty based on an informal relationship of confidence between debtor and her grandmother who was "made vulnerable by her age and stroke").

As will be discussed, this matter involves a power of attorney pursuant to which Bartlett appointed the Debtor her agent for purposes of dealing with all of her real and personal property. The Plaintiff contends, in part, that the Debtor became Bartlett's fiduciary upon execution of the power of attorney. That contention is clearly correct as a matter of Illinois law. *See* Estate of DeJarnette, 286 Ill.App.3d 1082, 222 Ill.Dec. 490, 677 N.E.2d 1024, 1030 (1997); Estate of Savage, 259 Ill.App.3d 328, 197 Ill.Dec. 575, 631 N.E.2d 797, 799 (1994); Boyce v. Fernandes, 77 F.3d 946, 950 (7th Cir. 2006). Illinois law is not determinative, however, for purposes of whether a fiduciary relationship under section 523(a)(4) existed. *See* In re Frain, 230 F.3d 1014, 1017 (7th Cir. 2000). Indeed, while someone appointed an agent under a power of attorney may be a fiduciary to the grantor of that agency under Illinois law, he does not by virtue of his appointment alone become a fiduciary for purposes of section 523(a)(4). *See* In re Johnson, 174 B.R. 537, 542 (Bankr. W.D. Mo. 1994)(court found that debtor was not acting in a fiduciary capacity where evidence demonstrated

that an elderly plaintiff, although she entered into power of attorney with debtor, did not give up management or control of her assets, was competent, and was aware of and consented to the transactions at issue).

If it is shown, however, that the person appointed under a power of attorney also is in an ascendant position *vis-a-vis* his principal because the agent has superior knowledge and/or power so that the principal is incapable of monitoring the agent's activities, a fiduciary relationship within the meaning of section 523(a)(4) may be found. *See* In re Marcet, 352 B.R. 462, 473 (Bankr. N.D. Ill. 2006); In re Hrabik, 330 B.R. 765, 773 (Bankr. D. N. Dak. 2005)("As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by section 523(a)(4). However, if a debtor has a sufficiently elevated fiduciary duty, section 523(a)(4) may apply to an agency relationship"); In re West, 339 B.R. 557, 567 (Bankr. E.D.N.Y. 2006)(court found a position of ascendancy necessary to show a fiduciary relationship existed between unsophisticated elderly retirees who appointed their pastor to handle their real property under a power of attorney).

Importantly, to come within the ambit of section 523(a)(4) which concerns formal trusts or trust-like relationships there must be property that could qualify as the res of the trust. In re Odeh, 431 B.R. 807, 816 (Bankr. N.D. Ill. 2010)(J. Wedoff)(*citing* Follett Higher Educ. Group, Inc. v. Berman, 427 B.R. 432, 436 (N.D. Ill. 2010))(noting that "courts have generally construed 'fraud or defalcation while acting in a fiduciary capacity' in § 523(a)(4) as applying only in circumstances akin to breach of a formal trust - that is, to debts involving property that could be the res of a trust and a relationship between the debtor and creditor that establishes a fiduciary relationship encompassing that property."). In the absence of a res, the fiduciary's breaching of an agreement will likely not

7

give a right a relief under section 523(a)(4). Id. In Odeh, Judge Wedoff concluded that the plaintiff could not maintain a section 523(a)(4) claim because she failed to allege "facts establishing a res to which [the debtor's] fiduciary duties would apply." Id. Specifically, "[t]here is no allegation that [the plaintiff] entrusted any funds to [the debtor] or that [the debtor] attempted to gain control over any of [the plaintiff's] property." Id.

If the requisite fiduciary relationship exists and a res is found, the question becomes whether a defalcation or fraud was committed by the debtor while acting in a fiduciary capacity. While the Code does not define "defalcation" and the Seventh Circuit Court of Appeals has not established with certainty what conduct constitutes a defalcation, *see* Marcet, 352 B.R. at 469, misappropriation of and failure to account for property is usually held to be a defalcation. *See* McGee, 353 F.3d at 539 ("There can be no doubt that, if McGee was the tenants' fiduciary, withdrawal and spending the money during the eviction litigation was an act of defalcation."); In re Zois, 201 B.R. 501, 506 (Bankr. N.D. Ill. 1996). This is so because such conduct, although not motivated by bad faith or fraudulent intent, nonetheless evinces a degree of culpability on the part of the debtor beyond mere negligence that merits excepting that particular debt from the debtor's discharge. *See* Marcet, 352 B.R. at 469. Courts use an objective standard to determine defalcation, In re Bledsoe, 2010 WL 2179721, * 7 (Bankr. C.D. Ill. Jun. 1, 2010), and it is not necessary to plead defalcation with particularity. In re Eisaman, 387 B.R. 219, 223 n. 1 (Bankr. N.D. Ind. 2008).

Fraud while acting in a fiduciary capacity, in contrast, must be plead with particularity pursuant to Fed. R. Civ. P. 9. Id. A "scheme to cheat another from the outset of the transaction" will constitute fraud. Bledsoe, 2010 WL 2179721, * 7 (*citing* Woldman, 92 F.3d at 547). Because "the statute treats fraud and defalcation the same," a showing that the debt arises from defalcation

or fraud while the debtor acted in a fiduciary capacity will result in a determination of nondischargeability under section 523(a)(4). Woldman, 92 F.3d at 547. At the pleading stage, therefore, in order to state a claim that a fiduciary relationship debt is excepted from discharge pursuant to section 523(a)(4), it is enough that defalcation is plausibly suggested.

A debtor misusing the fiduciary relationship he formed with a dependant, isolated, ill, elderly person to induce the transfer of that person's property for his own use and not accounting for his gain amounts to defalcation. See West, 339 B.R. at 569; Kohler, 255 B.R. at 666; Hrabik, 330 B.R. at 774. Particularly poignant is the exploitation of an elderly person's fear of being abandoned to a nursing home to acquire her property through misuse of the fiduciary relationship. See Kohler, 255 B.R. at 669.

In this proceeding, there are sufficient well plead allegations that tell a cohesive story of a debt arising from the Debtor's defalcation concerning Bartlett's property while he was acting in a preexisting fiduciary relationship with Bartlett. Before discussing how the allegations tell that story, however, it is necessary to address the Debtor's arguments that go to whether the claim is sufficiently described. In this regard, the Debtor complains that the allegations are too confusing. As noted, the Plaintiff incorporated the State Court Complaint in the Adversary Complaint. The allegations in the State Court Complaint, because it was prepared under Illinois' fact-pleading regime, are highly fact intensive. They are somewhat disjointed because the events related are not presented in a strict chronological fashion. Moreover, there appear to be a few contradictory allegations between the Adversary Complaint proper and the attached State Court Complaint. The allegations are not so disjointed, however, that the Debtor is not given fair notice of the claim. Compare, e.g., Nagel v. ADM Investor Services, Inc., 995 F.Supp. 837, 845 (N.D. Ill. 1998)(district court dismissed 16-

9

count, 93-page complaint because it was so confusing the defendant could not be expected to respond). Moreover, as discussed at notes 1, 2, and 3 *infra*, the contradictions are not of a nature to conclude that the Plaintiff has plead herself out of court. *See* London v. RBS Citizens, N.A., 600 F.3d 742, 747 n. 5 (7th Cir. 2010)(Court noted that in some circumstances contradictory allegations can negate the plaintiff's claim).

Adjusting for the proper chronology and where necessary, noting the immaterial contradictions, the allegations presented by the Plaintiff are as follows. Bartlett was born on January 28, 1929. (State Court Complaint attached to Adversary Complaint as Ex. 1 ("State Court Compl.") ¶ 52) In 1998, Bartlett and her husband purchased a condominium unit in Schaumburg, Illinois for $168,000, taking out a $40,000 mortgage. (*Id.* ¶ 4) Bartlett's husband died a year later in 1999, and she became sole owner of the condo unit. (*Id.* ¶ 6)

About five years later, in 2004, Bartlett, who was then 75 years old, befriended her hair dresser, Laura Carlini, and Carlini's future husband, the Debtor. (*Id.* ¶ 7) At the time, Bartlett was isolated from her family, suffering from mental and physical deterioration, and had significant visual impairment to the point of being unable to read financial documents and make informed financial decisions. (Adv. Compl. ¶¶ 8, 18; State Court Compl. ¶¶ 34, 56) When the Debtor and Carlini became involved in Bartlett's life they knew about her distressed situation and learned that Bartlett was in a somewhat precarious financial position because her sole source of income, social security, was barely enough to meet the monthly mortgage payments on the condo unit. (Adv. Compl. ¶ 10) The Debtor and Carlini went about securing Bartlett's confidence "by assisting her with personal activities such as grocery shopping and taking her to the doctor." (*Id.* ¶ 11) Because of her condition, Bartlett needed someone to help her with these essential daily tasks. (*Id.* ¶ 11) "Bartlett

10

soon became dependent" upon the Debtor's help and because of her "old age and deteriorating physical and mental condition," placed her trust in the Debtor. (*Id.* ¶s 11, 12)

On September 24, 2004, within a year of befriending the Debtor, Bartlett, having become dependent on and having placed her confidence in the Debtor, was persuaded by the Debtor to put her interest in the condo unit into a land trust with La Salle National Bank as trustee. (*Id.* ¶ 14, Exhibit A to State Court Compl.) Debtor unduly influenced Bartlett to convey the beneficial interest in the trust to him. (*Id.* ¶ 15; State Court Compl. ¶ 9) The Debtor convinced Bartlett that the transaction that she was participating in and the documents she was signing (which she could not read or fully understand) amounted to a mere refinance, *i.e.*, a reverse mortgage of the property designed to keep her in her home for the rest of her life. (State Court Compl. ¶s 29 and 33)[1] Plaintiff points out that the notation "Re Fi" was placed on the direction to convey. (State Court Compl. ¶ 18)

The Debtor also convinced Bartlett to sign powers of attorney, first in Carlini's favor and later in his favor. (Adv. Compl. ¶ 17) Specifically, on October 8, 2004, Bartlett executed an Illinois Statutory Short Form Power of Attorney naming Carlini as her "attorney-in-fact (or agent)" to act for Bartlett with respect to a great many categories of powers, including real estate transactions,

---

[1] The allegations in the State Court Complaint that the Debtor persuaded Bartlett to sign the papers to effect transfer of title to a trust of which the Debtor and Carlini were beneficiaries by convincing Bartlett it was only a refinance, may contradict the allegation in paragraph 15 of the Adversary Complaint. Paragraph 15 states that the Debtor and Carlini persuaded Bartlett to transfer ownership by promising her that it would ease Bartlett's financial pressures. If the attachment to the complaint contradicts and negates the plaintiff's claim asserted in the complaint itself a dismissal is warranted because the attachment prevails. RBS Citizens, 600 F.3d at 747 n. 5 (*citing* Thompson v. Illinois Dep't of Prof'l Regulation, 300 F.3d 750, 754 (7th Cir. 2002)). Here, although the allegations in the attached State Court Complaint may contradict the Adversary Complaint, it does not negate the section 523(a)(4) claim. Either scenario when presumed true presents a story of misuse of the fiduciary relationship by a fiduciary inducing the transfer of the property.

financial institution transactions, tangible personal property transactions, and "all other property powers and transactions." (*Id.*; State Court Compl. Ex. C) On the same day, Bartlett signed an Illinois Statutory Short Form Power of Attorney for Health Care naming Carlini her agent to act on her behalf "to make any and all decisions . . . concerning . . . personal care, medical treatment, hospitalization and health care . . ." (*Id.*; State Court Compl. Ex. D)

On October 15, 2005, Bartlett executed a Power of Attorney for Property and a Power of Attorney for Health Care.[2] (State Court Compl. ¶¶ 12, 13) These powers of attorney named the Debtor as Bartlett's agent to act on her behalf with respect to the same broad categories of property powers and transactions and to make decisions concerning Bartlett's personal and medical care. (State Court Compl. Exs. E, F)

About five months later, on February 21, 2006, Debtor caused a mortgage to be recorded against the condo which secured a $168,000 loan he obtained from Argent Mortgage Company.[3] (Adv. Compl. ¶ 20)  The Debtor "used the [loan] proceeds for himself without providing any explanation or accounting to Bartlett and without giving her any of the funds." (*Id.*; State Court Compl. ¶¶ 25, 26). The Debtor signed a Warranty Deed in Trust in favor of Chicago Title Land Trust Company on April 19, 2006. (State Court Compl. ¶ 14; State Court Compl. Ex G). Bartlett revoked the powers of attorney about five months later. (*Id.* ¶ 15) On February 8, 2007, a Trustee's

---

[2] In the Complaint, Plaintiff alleges that the powers of attorney in favor of Debtor were executed on October 15, 2004. (Adv. Compl. ¶ 17) This date is inconsistent with the execution date of October 15, 2005, referenced in the State Court Complaint. This discrepancy is of no significance to the sufficiency of the claim.

[3] This date for the recording of the Argent mortgage is inconsistent with the recording date of March 7, 2006 in the State Court Complaint found at paragraph 25. Again, the discrepancy is immaterial.

Deed was recorded (apparently twice) deeding title to the condo to Chicago Title Land Trust Company (State Court Compl. ¶s 22, 23) Debtor then stopped making the Argent mortgage payments, which precipitated a foreclosure sale by the mortgagee and the ultimate eviction of Bartlett from the condo "to housing for persons with limited resources." (Adv. Compl. ¶ 23, 24; State Court Compl. 46, 48)

The allegations tell a cohesive story of a relationship of trust premised on a discrepancy in knowledge or power which gave the Debtor a position of ascendancy over Bartlett in existence prior to the defalcation. The allegations plausibly suggest that the Debtor had superior knowledge and/or power over a physically and mentally compromised, visually impaired, and isolated elderly widow facing financial difficulties and needing the most basic of assistance. Bartlett reposed confidence in the Debtor to handle her physical, medical, and financial needs. The Debtor took advantage of the situation by unduly influencing Bartlett to gain control over Bartlett's property. The powers of attorney, while alone not establishing the fiduciary relationship, and apparently not acted on, are nonetheless part of the story of Bartlett's confidence in the Debtor. The allegations concerning Debtor's conduct in obtaining title to the condo, placing a mortgage on it, using the loan proceeds for himself, and leaving Bartlett in the lurch state a claim for defalcation.[4] This court concludes that

---

[4]

The Plaintiff's arguments focus on defalcation and less is said in the briefs of the purported fraud. The Debtor contends that fraud has not been adequately alleged as required by Fed. R. Civ. P. 9, made applicable herein by Fed. R. Bank. P. 7009. As noted, the Seventh Court of Appeals has observed that section 523(a)(4) essentially treats defalcation and fraud the same. See Woldman, 92 F.3d at 547. If the pleader sets out allegations to plausibly suggest a defalcation as part of the section 523(a)(4) claim examining whether the allegations meet the Rule 9 particularity requirement is unnecessary. In any event, keeping in mind that "states of mind" may be plead generally, see Rule 9(b), the court concludes that the allegations of the Complaint also satisfy the heightened pleading requirements of Rule 9, in that they sufficiently described the "who, what, when, where and how" of the purported fraud in a way to put the Debtor on notice of what he is defending against. See Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007)(citing DiLeo v. Ernst & Young, 901 F.2d 624, 626 (7th Cir. 1990)).

the allegations of the Adversary Complaint describe the claim in sufficient detail and suggest a plausible right to relief under section 523(a)(4) of the Code.

Turning to Count II of the Adversary Complaint, section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "To state a claim under § 523(a)(6) . . . , a creditor must allege (1) a tortious injury, (2) committed willfully, and (3) committed maliciously." Odeh, 431 B.R. at 817. The United States Supreme Court has interpreted willful as used in section 523(a)(6) to mean that the injury itself, not just the act that caused it, is deliberate and intended by the debtor. Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). At the pleading stage therefore, "[a] creditor must plead . . . that the debtor actually intended to harm him and not merely that the debtor acted intentionally and he was thus harmed." Odeh, 431 B.R. at 807 (*quoting* In re Burke, 398 B.R. 608, 625-26 (Bankr. N.D. Ill. 2008)).

Maliciousness as used in section 523(a)(6) has been defined as a "conscious disregard of one's duties without just cause or excuse; it does not require ill-will or specific intent to do harm." In re Thirtyacre, 36 F.3d 697, 700 (7th Cir. 1994)[5]; *see also* In re Wright, 184 B.R. 318, 324 (Bankr. N.D. Ill. 1995)(defining "malicious" as "wrongful and without just cause or excuse even in the absence of personal hatred, spite or ill will."). The application of Thirtyacre's definition of

---

[5] The reliance on the Thirtyacre definition of maliciousness has been called into doubt. *See* In re Jorenby, 393 B.R. 663, 666-67 n. 2 (Bankr. N.D. Wis. 2008); In re DeMarco, 240 B.R. 282, 289 (Bankr. N.D. Ill. 1999). In Jorenby, the court opined that the description of 'malice' in Thirtyacre "should be given little weight" because "it did not determine the case, nor was it carefully considered." Id. The court instead relied on a similar definition of malice found in In re Ries, 22 B.R. 343 (Bankr. W.D. Wis. 1982), which calls for knowledge of the harmful injury - "what is required is that the debtor know that his act will harm another and proceed in the face of that knowledge." Id. In DeMarco, the court felt that the definition of "willful and malicious" proffered in Thirtyacre was superseded by the definition in Geiger. 240 B.R. at 289.

maliciousness in every scenario is not readily apparent. It has sometimes been difficult to gauge what types of nonaggressive conduct, *i.e.*, conduct that is not motivated by ill will, qualifies as being taken in "conscious disregard without just cause or excuse." Indeed, it has been observed that it is necessary for courts to determine malice on the totality of the circumstances because "there has been surprisingly little judicial and scholarly commentary discussing the degree or nature of 'wrongfulness' that constitutes 'malice' under section 523(a)(6)." In re Bressler, 387 B.R. 446, 455 (Bankr. S.D.N.Y. 2008)(*quoting* Viener v. Jacobs (In re Jacobs), 381 B.R. 128, 139 (Bankr. E.D. Pa. 2008)). It can at least be said, however, that the "key to maliciousness under § 523(A)(6)" is consciousness of wrongdoing. *See* In re Young, 428 B.R. 804, 818 (Bankr. N.D. Ind. 2010); In re McCarthy, 179 B.R. 876, 880 (Bankr. N.D. Ill. 1995). Undue influence is the type of wrongful conduct that has been held to satisfy the maliciousness prong of section 523(a)(6). *See* In re Scott, 227 B.R. 918, 922 n. 5 (Bankr. S.D. Fla. 1998).

Because intent and knowledge are closely related concepts, the determination of willfulness and maliciousness is sometimes coextensive. *See* Odeh, 431 B.R. at 817 n. 9 (Judge Wedoff observed that "an act taken with intent to cause harm will almost always be inherently wrongful and without justification or excuse."). Indeed, maliciousness has been viewed as a subset of willfulness. Id. As such, it may be argued that while maliciously committed injuries are always willfully committed, the reverse may not always be true because a willfully committed injury may not necessarily also be maliciously committed. *See* Young, 428 B.R. at 818.

Despite the possible overlap of willfulness and maliciousness, the phrasing of section 523(a)(6) calls for their distinction. Id.; Odeh, 431 B.R. at 817, n. 9. As such, the elements of willfulness and maliciousness must be separately plead and proven by the plaintiff and separately

15

found by the court. Id. Here, although there is a smattering of the mere recitation of the buzzwords "willful and malicious" in the Adversary Complaint, the Plaintiff has plead factual allegations suggesting a willfully and maliciously committed tortious injury. First, the alleged injury is the Debtor's taking of Bartlett's property. *See* Scott, 227 B.R. at 922 n. 5. The allegation that the "Debtor intended to cause [that] injury to Bartlett" by unduly influencing her to convey her interest in the condo (Adv. Compl. ¶ 34) plausibly suggests a willfully committed tortious injury. Finally, the allegations of undue influence, how the transfer of the property was induced through misrepresenting its true character to Bartlett as a refinance, and that the Debtor helped himself to the equity plausibly suggests that the injury was committed maliciously. The court concludes that the Plaintiff has suggested a plausible right to relief under section 523(a)(6) of the Code.

## CONCLUSION

For the reasons stated, an order will be entered denying the Motion of the Defendant to Dismiss Adversary Complaint to Determine Dischargeability. The order will also require the Defendant to file an answer by a certain date and will set a status hearing thereafter in this proceeding.

Dated: **OCT 14 2010**

ENTER:

_____
SUSAN PIERSON SONDERBY
United States Bankruptcy Judge